We'll hear the next case, United States v. Farmers Insurance Exchange. Good morning. If the Court please, Michael Hayes. Peter Jason is to my left. I would start, if I may, by stating categorically and unequivocally that there was no intent to mislead the lower court in the pleadings, there was no intentional exaggeration, there was no dishonesty, and there was no bad faith in the pleadings. Well, I mean, didn't Mr. Hayes allege that he had personal knowledge that every insurer named in the indictment defrauded Medicare every time they entered a settlement? That is the way the pleadings literally read. That is indeed the way the pleadings literally read, right? And doesn't the complaint seek billions of dollars of damages which would only be available in effect if that were true? In other words, the argument about what a massive case this is hinges on the fact that this is not just that Mr. Hayes was aware of a handful of cases in which he personally participated where arguably there was this kind of False Claims Act problem. He says this is a mega case. That is correct. That is correct, and he uses the word all. He is you, isn't he? That is correct. You are Mr. Hayes. I am Mr. Hayes, and I stand before you and tell you unequivocally that there was no intent, there was no intentional malfeasance. Yes, the word all was used. You say that it was incorrect. In your brief, page 22, you say the literal use of the word all was admittedly incorrect. That is correct. I admit that the literal use of the word was incorrect. That does mean— So are you conceding that you didn't have personal knowledge about the involvement of each named defendant? The original attorneys who sued the case used, for example— What's the answer, yes or no? Well, it's yes and no, Your Honor, in that the original attorneys who sued the case named a bunch of defendants, and we had personal knowledge and releases from the vast majority of the defendants and their subsidiaries. We sued those defendants. As it turned out— And there's no allegation that those are false statements in those cases. That's correct. How do those releases support a claim that the insurer who was in the case with that release committed a fraud? Those releases are exemplars as to the evolution of the releases to include language regarding indemnification and included language regarding Medicare reimbursement, so that they knew that Medicare was involved. As to all the defendants, for example, Maiden Holdings Company was sued as a defendant in this case by the original attorneys. As it turned out, Maiden Holdings had only purchased the non-liability portion of GMAC. Now, that was an error by the original attorneys. So when we concede in page 22 of our brief that it is possible that all the defendants that have been sued here, in view of the fact that Maiden Holdings, the attorneys didn't figure out that they were the wrong defendant— Many of these releases are not signed by anyone, are not executed.  I redacted the names of the plaintiffs because they're not germane. They are discoverable. The defendants have all the original releases. And as with a QTAM, you have to have evidence of actual instances of violations by the defendants. And we have 21 releases in our complaint involving Medicare clients where, as far as I know— and I can't say this in every instance, but as far as I know, Medicare was not contacted and not reimbursed. On page— Not the original attorney. You said the original attorneys? Were Berg and Androffi, Joel Androffi out of Houston. It's not you. That's correct. And then when the government decided not to intervene because they merged this case with Takamoto that was thrown out, thinking it was the same theory, and it's not. When they withdrew, then I took additional other counsel, local counsel, who represented me for a time. And then when the magistrate judge issued his sanctions intimidation issue, Mr. O'Connell withdrew under that instance, and I am left with Mr. Jason. So the attorneys have evolved a little bit. I'm the one who is both the relator and have worked on the case, so I understand it the best. So you could have brought this action against just those companies about which you had personal knowledge, your former clients, I assume. Well, all of—yes. Couldn't you have done that? Yes. All of the— Why wasn't it done that way instead of trying to reach the entire industry? Every defendant, well, other than the subsidiaries, that is named in the complaint, I had personal dealings with and we had releases with. This was a scheme that I perceived to be nationwide involving all of these insurance companies and others. So it's based on industry-wide, your sense of industry-wide practice. That is correct. Rather than knowledge as to what each specific defendant did. It's both because we— But when you say it's both, are you saying that in some cases you had personal knowledge, in other cases you didn't and were basing it in those cases where you didn't have personal knowledge on your sense of industry-wide practice? Is that what you're saying? Well, I have personal knowledge most easily with respect to the ones that were Medicare clients and those 21 releases that are attached. Right. And if you had limited the case to those people, we wouldn't be talking about sanctions. Well, that is correct. But I also have written books on this. I've given lectures on this. I spoke with Jeffrey Signor, who was brought into the case midway by the magistrate. We gave CLEs on this where we lectured to attorneys and to adjusters. And I had adjusters talk to me and say, why should we notify CMS of this claim and resolution, even if it involves a Medicare client, because they're never going to find out about it. I understand you believe, as you just confirmed to Judge Katzmann, that there was an industry-wide scam. Correct. But if you had limited the lawsuit to the ones that you knew about because they were your clients and then through discovery found out information about all the other companies, you certainly would have been in a better position to fight off sanctions. That is absolutely correct. And the decision to involve all the defendants against whom or for whom I had releases and their subsidiaries was the decision of Berg and Androffi out of Houston. I didn't see the complaint until it was filed. But your name is on it. Absolutely. Absolutely. But that was their decision, as alleged key TAM specialists. That's what they decided. I do think that the scheme, and the best example is FedEx, as far as the scheme goes. We do not have direct evidence that they violated and failed to pay back Medicare. However, my experience in the industry, lecturing, talking to adjusters, I've lectured from Buffalo to Albany. I've talked to people from New York City to California on this issue. It was rampant. And the idea that they issue these releases, they include, as they evolved, Medicare and indemnification provisions such that the plaintiff's attorneys cannot object to it, because if they do, they can be brought in. This was industry-wide. And since there was contact with FedEx and with some of the others against whom I did not have direct Medicare releases, Bergen Androffi chose to involve them. Now, as it turned out, and as we found with Maiden Holdings, with Nationwide, and some company out in Arizona that were not involved in this business, they contacted us and we approached the U.S. attorney and said, listen, these particular defendants do not belong in this litigation. So we did that. But, for example, you take Progressive, right? Finish your point, please. Yes, sir. Progressive called us in on a Rule 11 and said, here are two releases for Medicare clients that you saw to Mr. Hayes were paid. We said, yes, we did, in 2010, 2011. Therefore, we want you to discontinue under Rule 11. And the response was, first of all, those were not listed as Medicare. But, secondly, we have two other releases from 2006 and 2007 involving Medicare clients and Progressive. All you have to do, Mr. Progressive, is show us that Medicare was contacted and their issue resolved. We'll discontinue against you, period. Show us two releases. They said, we don't have to prove our case. So that is the short version. Thank you. Good morning, Your Honor. May it please the Court. David Yochai for the Farmers' Appealese and the other appealees on our brief, other than FedEx, who will argue separately. Your Honor, Mr. Hayes talks to Bedberg and Androffi and other lawyers. Mr. Hayes personally verified the operative complaint in this manner, and that's at A268 in the record. So, clearly, if he verified it, we can assume that he reviewed it in some way. The standard here is abuse of discretion. I submit that there is no abuse of discretion here. Hayes admits that the standard is abuse of discretion. The magistrate judge found that Hayes acted in subjective bad faith. Mr. Hayes tries to minimize his numerous statements about all defendants, which are rampant throughout the complaint. There are at least 24 examples where he says all defendants engaged in this nationwide conspiracy. Mr. Hayes, I agree with you for the sake of this argument that those generalized allegations are sanctionable and unfounded. Is it your argument that the complaint does not plead a cause of action validly against any of the people that you represent? Yes, Your Honor. I don't believe he has facts against anybody in his complaint. He attaches several. So why isn't the – I mean, certainly there are some egregious examples where it's clear that defendant does nothing against some defendants. I'm puzzled as to why the appropriate procedure wouldn't be to try to figure out if there's a skinny complaint inside the fat one, and for the defendants to do as FedEx did, make individual motions to dismiss, and the allegations are evaluated against them, and the ones that were improperly deemed get sanctions in the form of their attorney's fees and whatever it costs them to litigate the case. But if there are any cases that are plausibly pled in this complaint, why do they get a free pass? Or why does it get dismissed as to them because Mr. Hayes overblew his allegations? Your Honor, I don't believe any of them are plausibly pled. He has those cases. But do we have to find that? I mean, do we have to review this? I don't believe so. The terminating sanction here was due to the obvious misstatements, the obvious violations of Rule 11. And, you know, under the Shango case, you can dismiss the whole case when you are uncomfortable that the plaintiff here is making misstatements to the court. And the magistrate judge considered a lesser sanction or considered other options and just felt the issue of deterrence was paramount here. And this wasn't one time. He filed four different complaints. Even after the magistrate judge held an order to show cause here, even after FedEx notified him that there was a Rule 11 problem, he didn't withdraw the offending allegations. In fact, in his proposed second amended complaint, he still had the offending allegations. And then again, he withdrew that and then put in a second, second proposed amended complaint with more offending allegations. He didn't drop any of the defendants. He didn't take any steps here to rectify these problems. And I think that's what the court finally had had enough after five chances. It said, you know, there is no case here. By the way, he still can't satisfy Rule 9b in this case. The court found that it was a futile complaint. Under the Takamoto decision, which I submitted to the court, he can't even satisfy Rule 8 because he has no specific example of a conditional payment made by Medicare that was unreimbursed. He cites this progressive example. The story on the progressive example was they said, hey, Mr. Hayes, we paid these people. We paid Medicare. How can you claim that in your complaint? And then he said, oh, you know what, it wasn't that. It was some other release. But he's talking — that's not even in his complaint. So the problem we have here is the facts keep getting made up. We don't know the facts about any of these people. In the example of farmers, he's got issues. Our people were 20 years old. They couldn't possibly have been Medicare beneficiaries. That's the problem here. There's just nothing to this complaint, and that's why the magistrate judge, again, after four times, had had enough. Is the first-to-file rule jurisdictional? So on the first-to-file rule, if you look at the Wood case — it's your case in the Second Circuit here — they found that the court, because it's a statutory issue, if there is Article III jurisdiction, you are able to decide the matter on a ground like either Rule 11 or other grounds because it goes to the jurisdiction under the statute, not the Article III jurisdiction. You have, though, the statement — you have ARBAR, right? ARBAR requires that there be a clear statement from Congress before finding a requirement to be jurisdictional. And do we have that here? It's true. Well, what I think we have here is the court could affirm on either ground. Clearly, Takamoto was filed first. There's no doubt about that. So he is second filed, and clearly his case was pending at the time of Takamoto. But since we do have the Rule 11 decision, the Rule 11 decision says this complaint couldn't even satisfy — the pleadings were improper, couldn't even satisfy the evidentiary basis to make a pleading. So I think once you're in under Article III, because you're in under the FCA, you do have the power to decide the question. The statute — the first-to-file statute says nobody shall file a claim. It doesn't say the court can't consider a claim that somebody files. Agreed. That's right. I'm over my time. Thank you. May it please the Court. My name is John Campbell, and I am representing the FedEx defendants. As Mr. Hayes acknowledged, he had no direct knowledge, no personal knowledge of any of the behavior of the FedEx defendants. The FedEx defendants followed Rule 11 procedure, asked Mr. Hayes to dismiss his complaint against FedEx, and his response was not only that he would not do that, but to insist that he did indeed have personal knowledge, the exact thing that he just denied to the court. And then he went forward and then filed — once FedEx filed its Rule 11 motion, Mr. Hayes went ahead and filed another second amended complaint and a motion for X without a discovery, asking to get the same type of discovery that would help prove his case. I think it's important that Mr. Hayes's claim that he included FedEx — and he acknowledges in his reply that he would not meet the per se standard with respect to FedEx because his claim was one based on a, quote, industry-wide scheme. However, the only industries that Mr. Hayes discusses are the insurance industry and the trucking industry. And as FedEx explained or demonstrated to the district court, the FedEx defendants are not in the trucking — well, not all the FedEx defendants could be categorized as being in the trucking industry. FedEx office, FedEx services, for instance, do not engage in trucking. So whatever knowledge Mr. Hayes might have of those industries could not possibly be extrapolated to the defendants, the FedEx defendants that he has identified in his complaint. When, Judge Poole, you asked Mr. Hayes why he did it this way, and he answered that question. In his response to FedEx's Rule 11 motion, he said — and this is A1325 — the intentional general structure of this KETAM action brought to recover funds that are owed to the government was to sue the parent and its subsidiaries in order to recover as much of the funds as possible. So it was clear to FedEx at that time that, at least with respect to the holding companies, and we believe with respect to the defendants of which Mr. Hayes did not have personal knowledge, that the reason he was doing this was simply to maximize his recovery. And because he knew that by adding as many defendants as possible to this case, those defendants would possibly have to settle with him or he would have leverage over them to settle the case. And that's exactly what Rule 11 is designed to prevent. It's designed to, when a party makes claims that he does not have the factual basis for, or in this case, of which he knew to be untrue, because as Mr. Hayes claimed multiple times in his pleading, although he's denied it now, he claimed to have personal knowledge. So he must have known at the time those claims were made that he did not have that knowledge. And Rule 11 is the mechanism for a party to avoid getting involved in a case, having to spend money if the plaintiff's claims do not have the requisite factual basis. And that is exactly what FedEx did in this case. It availed itself of Rule 11. And this is really a textbook case of how Rule 11 should work, which is that the judge stops proceedings and looks into this issue of whether the plaintiff, in fact, had the requisite factual basis for the claims that he made before requiring the parties to engage in costly discovery at which point the plaintiff would most likely want to enter settlement negotiations and would have leverage over the parties to avoid those discovery expenses. So is it your view that the relator need not have acted in bad faith but only with objective, unreasonable evidence? Well, there are two motions here on which the magistrate ruled and on which the district court ruled. One is under 11C2, which is FedEx's motion. And under that motion, it is true that bad faith need not be demonstrated. The only thing that need be demonstrated is objective unreasonableness. And in footnote 7 of the report and recommendation, the magistrate indicated that that motion was also being granted and that Mr. Hayes met that requirement, which was a lesser requirement of CNTR than the bad faith. But also the district court specifically ruled on FedEx's motion and granted it. So under that 11C2 motion, that is correct. No bad faith need be demonstrated. And the extent that those claims would address the claims that the magistrate identified as violating that were claims of all and covered all the defendants, I think that that would be sufficient for this court to affirm the dismissal as to all defendants. Under 11B3, which is the court's own motion, under that standard is subjective bad faith, which we believe has been amply demonstrated in this case. Can I just go back because I'm a little puzzled by the first part of what you just said? You made a motion. And what relief did you request in your motion as apart from the order to show cause from the magistrate judge? The relief we requested was that the FedEx defendants be dismissed from the case. The FedEx defendants be dismissed, and did you not ask for attorney's fees, et cetera? We did ask for attorney's fees, Your Honor. And that part was denied. That's the part that was denied. That is correct. So if for some reason we disagreed with the sanction of total dismissal, that's not about your client. Your client has a separate motion that is based on objective unreasonableness that would lead to the dismissal of your client even if for some reason we found there was no bad faith. Is that the idea? Well, that is true. Under the motion that we filed, that was the relief that we sought, and that is a motion that was also granted by both the magistrate and his report and recommendation by the district court. And you have not cross-appealed the denial of the motion insofar as it sought attorney's fees? We did not. We did not file a cross-appeal to this court on that basis. Thank you. Thank you. I believe I have a couple minutes, if I may. You have three minutes. Yes, sir. A very important point. Counsel said that we failed with 9B because we do not have bills from CMS saying that we owe the money, and we didn't include that in our papers. Well, by analogy, if a corporation earns income and the IRS does not know about the income, taxes are still owed. That's the law. If a corporation conceals its obligation of letting the IRS know about a liability, that does not mean that it doesn't owe the taxes. Well, in a like manner, in this Medicare realm, that in QTAN, here the defendants concealed, avoided, and decreased an obligation to pay or transmit money to the government, the statute reads that the primary plan shall reimburse Medicare. They did not. They used a release, an instrument, as a means to get around it. So the point that we don't have demands from CMS is not fatal because I think it is totally analogous to the IRS. I'm not sure it's a question of demands. I'm still looking for some specific allegation that there was personal knowledge as to whether they did or didn't reimburse Medicare and as to whether all of these people in the releases were Medicare clients in the first place. Mr. Yohei said that in the case of his client, these people were 20 years old. Now, I don't know if there's anything in the record that supports that, but I certainly didn't see anything in the complaint that specifically alleges, here's a person who was a Medicare, your clients, some of these people, the releases are ones that your firm prepared maybe at the behest of the other side. I don't know. It doesn't say anything about that in the complaint. It would have been perfectly easy to say client AB was a 70-year-old man who was on Medicare, and he was treated at the hospital, and Medicare was billed this amount of money. And there's nothing like that in the complaint. Well, the only way we're going to know that is to ask Medicare. Well, I understand there's a further question as to whether you know whether they, out of the goodness of their hearts, reimbursed Medicare, but I'm saying there's not even anything in the complaint in any specific case that says, here's the money that Medicare should have been reimbursed. Well, I do say there are 21 instances in my complaint that attach releases that are identified as Medicare beneficiaries. Now, I don't say that, and I say in one involving State Farm that I know that Medicare paid money and I know that Medicare was not reimbursed. As to the other 20 releases, I know they're Medicare clients. I know that I didn't reimburse them because I was doing a different procedure at that time, and I did not collect Medicare's expenses, so I did not recover their subrogation funds, so I did not repay Medicare. But Medicare should have, according to the statute, been noticed. And the mere fact that the defendants paid my clients does not get them off the hook. Okay? So there's 21 instances specific. Now, in some instances, I have a lot of releases. I'm sorry? Notice requirement on the part of the insurers to notify Medicare when they pay a claim, is that part of the statute? Well, now, because Medicare wasn't getting paid in 06 to 11, they initiated a $1,000-a-day penalty if the insurers did not contact Medicare. And then they put it off for five years. So they have an affirmative obligation? Now, as of October of 2011, they've got an affirmative obligation to notify Medicare that this client has a personal injury claim. But prior to that, under penalty of $1,000-a-day, but prior to that, there was no obligation on their part to notify. And your case was about the prior period? Correct. Thank you. Thank you. Thank you all for your arguments. The Court will reserve decision.